**EXHIBIT 4**

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call/Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-----------|---------|---------|----------|
| | | | | 610 / 0054 | | 524 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** WHISKEY BARREL & CIGAR SHOPPE
19772 E. COLIMA RD.
ROWLAND HEIGHTS, CA 91748

**Lender:** HANMI BANK
ROWLAND HEIGHTS OFFICE
18720 E. COLIMA RD.
ROWLAND HEIGHTS, CA 91748

**Guarantor:** HELEN M. FINCH aka HELEN MYUNG SUK FINCH
19772 E. COLIMA RD.
ROWLAND HEIGHTS , CA 91748

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of Guarantor's Share of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**GUARANTOR'S SHARE OF THE INDEBTEDNESS.** The words "Guarantor's Share of the Indebtedness" as used in this Guaranty mean an amount not to exceed Three Hundred Forty Thousand & 00/100 Dollars ($340,000.00) of all the principal amount, interest thereon to the extent not prohibited by law, and all collection costs, expenses and attorneys' fees whether or not there is a lawsuit, and if there is a lawsuit, any fees and costs for trial and appeals.

Guarantor's Share of the Indebtedness will only be reduced by sums actually paid by Guarantor under this Guaranty, but will not be reduced by sums from any other source including, but not limited to, sums realized from any collateral securing the Indebtedness or this Guaranty, or payments by anyone other than Guarantor, or reductions by operation of law, judicial order or equitable principles. Lender has the sole and absolute discretion to determine how sums shall be applied among guaranties of the Indebtedness.

The above limitation on liability is not a restriction on the amount of the Note of Borrower to Lender either in the aggregate or at any one time.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE GUARANTOR'S SHARE OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON A CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Guarantor's Share of the Indebtedness remains unpaid and even though the Guarantor's Share of the Indebtedness may from time to time be zero dollars ($0.00).

**OBLIGATIONS OF MARRIED PERSONS.** Any married person who signs this Guaranty hereby expressly agrees that recourse under this Guaranty may be had against both his or her separate property and community property.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or

# COMMERCIAL GUARANTY
## (Continued)

Loan No: 4892921

Page 2

demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender to (A) make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness; (B) proceed against any person, including Borrower, before proceeding against Guarantor; (C) proceed against or apply collateral for the Indebtedness, including Borrower's collateral, before proceeding against Guarantor; (D) apply any payments or proceeds received against the Indebtedness in any order; (E) give notice of the terms, time, and place of any sale of the collateral pursuant to the Uniform Commercial Code or any other law governing such sale; (F) disclose any information about the Indebtedness, the Borrower, the collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or (G) pursue any remedy or course of action in Lender's power whatsoever.

Guarantor also waives any and all rights or defenses arising by reason of (H) any disability or other defense of Borrower, any other guarantor or surety or any other person; (I) the cessation from any cause whatsoever, other than payment in full, of the Indebtedness; (J) the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Guarantor and Lender; (K) any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise; (L) any statute of limitations in any action under this Guaranty or on the Indebtedness; or (M) any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate, and including any such modification or change in terms after revocation of this Guaranty on the Indebtedness incurred prior to such revocation.

Guarantor waives all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive.

Guarantor waives all rights and any defenses arising out of an election of remedies by Lender even though that the election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise.

Guarantor waives all rights and defenses that Guarantor may have because Borrower's obligation is secured by real property. This means among other things: (N) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower. (O) If Lender forecloses on any real property collateral pledged by Borrower: (1) the amount of Borrower's obligation may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price. (2) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's obligation is secured by real property. These rights and defenses include, but are not limited to, any rights and defenses based upon Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure.

Guarantor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Guarantor might otherwise be entitled under state and federal law. The rights and defenses waived include, without limitation, those provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code. Guarantor acknowledges that Guarantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender. Guarantor further understands and agrees that this Guaranty is a separate and independent contract between Guarantor and Lender, given for full and ample consideration, and is enforceable on its own terms. Until all of the Indebtedness is paid in full, Guarantor waives any right to enforce any remedy Guarantor may have against the Borrower or any other guarantor, surety, or other person, and further, Guarantor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

**Guarantor's Understanding With Respect To Waivers.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**Right of Setoff.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**Subordination of Borrower's Debts to Guarantor.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be

# COMMERCIAL GUARANTY
## (Continued)

**Loan No: 4892921**

Page 3

superior: to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**Miscellaneous Provisions.** The following miscellaneous provisions are a part of this Guaranty:

**AMENDMENTS.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**ATTORNEYS' FEES; EXPENSES.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**CAPTION HEADINGS.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**GOVERNING LAW.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.

**CHOICE OF VENUE.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of LOS ANGELES County, State of California.

**INTEGRATION.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**INTERPRETATION.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower" and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**NOTICES.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**NO WAIVER BY LENDER.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**COLLATERAL.** Guarantor acknowledges that this Guaranty is secured by a Deed of Trust on real property located in Los Angeles County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interests in Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease–option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty–five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**Definitions.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty

## COMMERCIAL GUARANTY
### (Continued)

Loan No: 4892921                                                      Page 4

shall have the meanings attributed to such terms in the Uniform Commercial Code:

**BORROWER.** The word "Borrower" means WHISKEY BARREL & CIGAR SHOPPE and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GUARANTOR.** The word "Guarantor" means everyone signing this Guaranty, including without limitation HELEN M. FINCH aka HELEN MYUNG SUK FINCH, and in each case, any signer's successors and assigns.

**GUARANTOR'S SHARE OF THE INDEBTEDNESS.** The words "Guarantor's Share of the Indebtedness" mean Guarantor's Indebtedness to Lender as more particularly described in this Guaranty.

**GUARANTY.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**INDEBTEDNESS.** The word "Indebtedness" means Borrower's Indebtedness to Lender as more particularly described in this Guaranty.

**LENDER.** The word "Lender" means HANMI BANK, its successors and assigns.

**NOTE.** The word "Note" means the promissory note dated October 31, 2008, in the original principal amount of $340,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**RELATED DOCUMENTS.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED OCTOBER 31, 2008.

**GUARANTOR:**

X _____
HELEN M. FINCH aka HELEN MYUNG SUK FINCH

LASER PRO Lending, Ver. 3.47.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2008.  All Rights Reserved.  - CA  E:\NOTE\CFI\LPL\E20.FC  TR-24774  PR-TL78UCC

**EXHIBIT 5**



APPRAISAL OF REAL PROPERTY

**FILE NO.:**

HMH 1004013

**LOCATED AT:**

20944 Quail Run Drive
Walnut, CA 91789

**FOR:**

HANMI BANK
3660 W. WILSHIRE BOULEVARD, PH-A
LOS ANGELES, CA 90010

**AS OF:**

APRIL 7, 2010

**BY:**

CALIFORNIA WILSHIRE APPRAISAL, INC.
3030 W. TEMPLE STREET, #204
LOS ANGELES, CA 90026

California Wilshire Appraisal | File No. HMH 1004013| Page #1|

Case 2:09-bk-46380-ER   Doc 13-3   Filed 04/19/10   Entered 04/19/10 19:00:25   Desc
Exhibit Exhibits - Uniform Residential Appraisal Report Page 8 of 24

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | | | |
|---|---|---|---|
| Property Address 20944 Quail Run Drive | City Walnut | State CA | Zip Code 91789 |
| Borrower N/A | Owner of Public Record Helen M. Finch | | County Los Angeles |

Legal Description TR=43162 Lot 45

Assessor's Parcel # 8765-017-028 — Tax Year 2009 — R.E. Taxes $ 5,353.42

Neighborhood Name N/A — Map Reference 679-G5 — Census Tract 4607.00

Occupant ☒ Owner ☐ Tenant ☐ Vacant — Special Assessments $ N/A — ☐ PUD — HOA $ ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) Update

Lender/Client Hanmi Bank — Address 3660 Wilshire Boulevard, PH-A, Los Angeles, CA 90010

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s).

**CONTRACT**

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ N/A — Date of Contract N/A — Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | One-Unit Housing Trends | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | Property Values ☐ Increasing ☒ Stable ☐ Declining | PRICE $(000) | AGE (yrs) | One-Unit 80 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | 452 Low 4 | | 2-4 Unit 0 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | 759 High 46 | | Multi-Family 10 % |
| | | 545 Pred. 23 | | Commercial 5 % |

Neighborhood Boundaries Colima Road to the north, the Orange Freeway (I-57) to the east, and Brea Canyon Road to the south & west. — Other 5 %

Neighborhood Description The subject is located in a predominant residential area. The subject neighborhood is comprised of mostly residential area consisting of average to good quality single family residences. With respect to convenience, the immediate neighborhood is rated good and has good overall appeal to the market. The Orange Freeway (I-57) is located adjacent to the subject.

Market Conditions (including support for the above conclusions) Supply for single family residences in the immediate subject area are in over supply and overall property values in the area are currently in a declining trend. There are no significant concessions, interest rate buydowns or financial concessions.

**SITE**

Dimensions See the plat map — Area 9,080 SF (7,256 SF usbl) — Shape Irregular — View None

Specific Zoning Classification LCRPD1000006U — Zoning Description Single Family Residence

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley | ☐ | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No — FEMA Flood Zone X — FEMA Map # 06037C1880F — FEMA Map Date 09/26/2008

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe

**IMPROVEMENTS**

Source(s) Used for Physical Characteristics of Property ☐ Appraisal Files ☐ MLS ☒ Assessment and Tax Records ☐ Prior Inspection ☐ Property Owner ☐ Other (describe) — Data Source for Gross Living Area FARES

| General Description | General Description | Heating/Cooling | Amenities | Car Storage |
|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | ☒ Concrete Slab ☐ Crawl Space | ☐ FWA ☐ HWBB | ☒ Fireplace(s) # 1 | ☐ None |
| # of Stories Two | ☐ Full Basement ☐ Finished | ☐ Radiant | Woodstove(s) # | ☒ Driveway # of Cars 2 |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | ☐ Partial Basement ☐ Finished | ☒ Other Unknown | ☒ Patio/Deck Deck | Driveway Surface Concrete |
| ☒ Existing ☐ Proposed ☐ Under Const. | Exterior Walls Stucco | Fuel Unknown | ☒ Porch | ☒ Garage # of Cars 2 |
| Design (Style) Conventional | Roof Surface Com. Shingle | ☐ Central Air Conditioning | ☒ Pool Pool/Spa | ☐ Carport # of Cars |
| Year Built 1986 (24 yrs) | Gutters & Downspouts Alum/Good | ☐ Individual | ☒ Fence Concrete | ☐ Attached ☐ Detached |
| Effective Age (Yrs) 10 yrs | Window Type Alum/Good | ☒ Other Unknown | ☒ Other Unknown | ☒ Built-In |
| Appliances ☐ Refrigerator ☐ Range/Oven ☐ Dishwasher ☐ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe) | | | | |

Finished area above grade contains: 7 Rooms — 3 Bedrooms — 3 Bath(s) — 1,714 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.) Unknown due to drive-by inspection.

Describe the condition of the property and data source(s) (including apparent needed repairs, deterioration, renovations, remodeling, etc.). Based upon inspection, the subject has been well maintained and no significant item(s) was observed that requires immediate repair.

Are there any apparent physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe.

File HMH 1004013: Page #2

Case 2:09-bk-46380-ER    Doc 13-3    Filed 04/19/10    Entered 04/19/10 19:00:25    Desc
Exhibit Exhibits - Any of Section Id Condition Appraisal Report Page 9 of 24 1013

| There are | 10 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 270,000 | | | to $ 729,888 | |
|---|---|---|---|---|---|---|
| There are | 32 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 452,000 | | | to $ 759,000 | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 20944 Quail Run Drive | 20878 Quail Run Drive | | 2703 S. George Lane | | 20821 E. Rocky Point Lane | |
| | Walnut, CA 91789 | Walnut, CA 91789 | | Walnut, CA 91789 | | Walnut, CA 91789 | |
| Proximity to Subject | | 0.10 mile west | | 0.50 mile south | | 0.25 mile southwest | |
| Sale Price | $ N/A | | $ 630,000 | | $ 527,500 | | $ 565,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 341.09 sq.ft. | | $ 314.74 sq.ft. | | $ 321.94 sq.ft. | |
| Data Source(s) | | MLS/FARES | | MLS/FARES | | MLS/FARES | |
| Verification Source(s) | | MLS #H09090230MR | | MLS #H10014478MR | | MLS #I09132776MR | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conventional | | Conventional | | Conventional | |
| Concessions | | Mortgage | | Mortgage | | Mortgage | |
| Date of Sale/Time | | 10/16/2009 | -37,800 | 03/05/2010 | | 02/04/2010 | |
| Location | Good | Similar | | Superior | -5,000 | Superior | -5,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 9,080 SF (7,256 SF Usb) | 6,660 SF(Usb) | | 5,336 SF (Usb) | +15,360 | 3,868 SF (Usb) | +27,104 |
| View | None | Similar | | City lights | -10,000 | City lights | -10,000 |
| Design (Style) | Conventional | Similar | | Similar | | Similar | |
| Quality of Construction | Average | Similar | | Similar | | Similar | |
| Actual Age | 1986 (24 yrs) | 1985 (25 yrs) | | 1987 (23 yrs) | | 1987(23 yrs) | |
| Condition | Good | Similar | | Simialr | | Similar | |
| Above Grade | Total \| Bdrms. \| Baths | Total \| Bdrms. \| Baths | | Total \| Bdrms. \| Baths | | Total \| Bdrms. \| Baths | |
| Room Count | 7 \| 3 \| 3 | N/A \| 3 \| 3 | | N/A \| 3 \| 3 | | N/A \| 3 \| 3 | |
| Gross Living Area | 1,714 sq.ft. | 1,847 sq.ft. | -10,640 | 1,676 sq.ft. | | 1,755 sq.ft. | |
| Basement & Finished | None | None | | None | | None | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Similar | | Similar | | Similar | |
| Heating/Cooling | FAU/CAC | Similar | | Similar | | Similar | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2-Car Garage | 3-Car Garage | -2,500 | 2-Car Garage | | 2-Car Garage | |
| Porch/Patio/Deck | Porch/Deck | Similar | | Similar | | Similar | |
| Fireplace | 1-Fireplace | 1-Fireplace | | 1-Fireplace | | 1-Fireplace | |
| Pool/Spa | Pool/Spa | None | +20,000 | None | +20,000 | None | +20,000 |
| APN | 8765-017-028 | 8765-015-021 | | 8765-020-016 | | 8765-018-016 | |
| Net Adjustment (Total) | | ☐ + ☒ - | -30,940 | ☒ + ☐ - | $ 20,360 | ☒ + ☐ - | $ 32,104 |
| Adjusted Sale Price | | Net Adj. 4.9 % | | Net Adj. 3.9 % | | Net Adj. 5.7 % | |
| of Comparables | | Gross Adj. 11.3 % | $ 599,060 | Gross Adj. 9.5 % | $ 547,860 | Gross Adj. 11.0 % | $ 597,104 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   FARES/MLS
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   FARES/MLS
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | None in the past 36 months | None in the past 12 months | None in the past 12 months | None in the past 12 months |
| Price of Prior Sale/Transfer | N/A | N/A | N/A | N/A |
| Data Source(s) | FARES | FARES/MLS | FARES/MLS | FARES/MLS |
| Effective Date of Data Source(s) | 04/07/2010 | 04/07/2010 | 04/07/2010 | 04/07/2010 |

Analysis of prior sale or transfer history of the subject property and comparable sales      The subject property and all selected comparable sales have not
transferred within the past thee years. Comparable Sales 4 and 5 are active listings and transfer history is not applicable.

Summary of Sales Comparison Approach      All selected comparable sales are located within the same market area. All comparables used were
considered to be the best available at the time of appraisal. All selected comparables are recent sales or listings that represent the subject market.
After adjustments, these comparables indicate a wide range of $557,860 to $599,060. Most weight is given to Sale 1 as it is located closest tot he
subject, we concluded the market value for the subject to be in the $590,000 range.

Indicated Value by Sales Comparison Approach $   590,000

Indicated Value by: Sales Comparison Approach $   590,000      Cost Approach (if developed) $   592,686      Income Approach (if developed) $   N/Ap

This appraisal is made ☒ "as is," ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a visual inspection of the exterior areas of the subject property from at least the street, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$ 590,000 , as of 04/07/2010 , which is the date of inspection and the effective date of this appraisal.

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. HMH 1004013 Page #3

Case 2:09-bk-46380-ER   Doc 13-3   Filed 04/19/10   Entered 04/19/10 19:00:25   Desc
Exhibit Exhibit - Only Unspected Residential Apprisal Report   Page 10 of 24

**COMMENTS ON ADJUSTMENTS**

Date of sale: A 1.0% of downward adjustment is made for Sale 1. Sales 2 and 3 were sold recent enought to reflect the current market condition. Thus, no adjustment is made. According to MLS, Sales 1, 2, and 3 have a range of 1% to 3% discount from original listing price. Considering the current declining market condition, a 3% of downward adjustment for Comparables 4 and 5 which are active listings.

Location: Sales 2, 3, and 4 are located on a cul-de-sac residential street less traffic. $5,000 downward adjustments are made.

Site: $8/SF of the lot size (if difference is +/- 1,000 SF)

View: Sales 2 and 3 have city light views. Thus, $10,000 downard adjustments are made.

Bedroom/bathroom: $2,500 per bedroom/bath

GLA: $80/SF (if difference is +/- 100 SF)

Garage: $2,500

Fireplace: $2,500

Pool:$15,000 / Spa: $5,000

**COST APPROACH TO VALUE (not required by Fannie Mae)**

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    Cost estimates based on Marshall and Swift
Valuation Data. The land to value ratio appears typical for the area. Site value estimated via the extraction method and allocation.

| | | | | | | |
|---|---|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | | | OPINION OF SITE VALUE | | =$ | 400,000 |
| Source of cost data   Marshall & Swift | | | DWELLING | 1,714 Sq.Ft. @ $ 101.99 | =$ | 174,811 |
| Quality rating from cost service  Good | Effective date of cost data  08/2008 | | N/A | Sq.Ft. @ $ | =$ | |
| Comments on Cos: Approach (gross living area calculations, depreciation, etc.) | | | Typical lanscape, pool, spa, etc | | =$ | 50,000 |
| Depreciation is via ecnomic age life having an effective age of 10 years | | | Garage/Carport    Unknown Sq.Ft. @ $ | | =$ | |
| and estimated remaining economic life of 60 years. | | | Total Estimate of Cost-New | | =$ | 224,811 |
| | | | Less | Physical | Functional | External | |
| | | | Depreciation | 32,125 | | | =$( | 32,125) |
| | | | Depreciated Cost of Improvements | | | =$ | 192,686 |
| | | | "As-Is" Value of Site Improvements | | | =$ | |
| Estimated Remaining Economic Life (HUD and VA only) | | 60 Years | INDICATED VALUE BY COST APPROACH | | =$ | 592,686 |

**INCOME APPROACH TO VALUE (not required by Fannie Mae)**

| | | | | |
|---|---|---|---|---|
| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | N/Ao | Indicated Value by Income Approach |

Summary of Income Approach (including support for market rent and GRM)

**PROJECT INFORMATION FOR PUDs (if applicable)**

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No   Unit type(s)  ☐ Detached  ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal Name of Project
Total number of phases _____  Total number of units _____  Total number of units sold _____
Total number of units rented _____  Total number of units for sale _____  Data source(s) _____
Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion
Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source(s)
Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

File No. HMH 1604013 Page #4

Case 2:09-bk-46380-ER   Doc 13-3   Filed 04/19/10   Entered 04/19/10 19:00:25   Desc
Exhibit Exhibit for 4Cb1 Inspection Check Detail Appraisal Report Page 14 of 24 013

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a visual inspection of the exterior areas of the subject property from at least the street, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

The appraiser must be able to obtain adequate information about the physical characteristics (including, but not limited to, condition, room count, gross living area, etc.) of the subject property from the exterior-only inspection and reliable public and/or private sources to perform this appraisal. The appraiser should use the same type of data sources that he or she uses for comparable sales such as, but not limited to, multiple listing services, tax and assessment records, prior inspections, appraisal files, information provided by the property owner, etc.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

3. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

4. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

5. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 2055 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

APPRAISER'S CERTIFICATION:  The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the exterior areas of the subject property from at least the street. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

File No. HMH 1004013 Page #6

Case 2:09-bk-46380-ER   Doc 13-3   Filed 04/19/10   Entered 04/19/10 19:00:25   Desc
Exhibit Exhibit 2 Only In Section Rid Declaration Report Page 13 of 24

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature _____ | Signature _____ |
| Name  Ho Joo Lee | Name _____ |
| Company Name   CWA | Company Name _____ |
| Company Address   3030 W. Temple Street, Suite #204 | Company Address _____ |
| Los Angeles, CA 90026 | _____ |
| Telephone Number   (213) 487-4055 | Telephone Number _____ |
| Email Address   cwa@cwaus.net | Email Address _____ |
| Date of Signature and Report   04/09/2010 | Date of Signature _____ |
| Effective Date of Appraisal   04/07/2010 | State Certification # _____ |
| State Certification #   CA AG 013395 | or State License # _____ |
| or State License # _____ | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State _____ | |
| Expiration Date of Certification or License   2/4/2011 | SUBJECT PROPERTY |
| ADDRESS OF PROPERTY APPRAISED | |
| 20944 Quail Run Drive | ☐ Did not inspect subject property |
| Walnut, CA 91789 | ☐ Did inspect exterior of subject property from street |
| | Date of Inspection _____ |
| APPRAISED VALUE OF SUBJECT PROPERTY $   590,000 | |
| LENDER/CLIENT | COMPARABLE SALES |
| Name _____ | |
| Company Name   Hanmi Bank | ☐ Did not inspect exterior of comparable sales from street |
| Company Address   3660 Wilshire Boulevard, PH-A, Los Angeles, | ☐ Did inspect exterior of comparable sales from street |
| CA 90010 | Date of Inspection _____ |
| Email Address _____ | |

Freddie Mac Form 2055 March 2005                          Page 6 of 6                          Fannie Mae Form 2055 March 2005

File No. HMH 1004013 Page #7

Case 2:09-bk-46380-ER    Doc 13-3    Filed 04/19/10    Entered 04/19/10 19:00:25    Desc
Exhibit Exterior-Only Inspection Residential Appraisal Report Page 14 of 24

| FEATURE | SUBJECT | COMPARABLE SALE #4 | | COMPARABLE SALE #5 | | COMPARABLE SALE #6 | |
|---|---|---|---|---|---|---|---|
| Address | 20944 Quail Run Drive | 2802 Woodview Court | | 20764 E. Rim Lane | | | |
| | Walnut, CA 91789 | Walnut, CA 91789 | | Walnut, CA 91789 | | | |
| Proximity to Subject | | 0.50 mile southwest | | 0.25 mile west | | | |
| Sale Price | $        N/A | $           544,900 | | $           599,000 | | $ | |
| Sale Price/Gross Liv. Area | $        sq.ft. | $   352.46 sq.ft. | | $   316.43 sq.ft. | | $    sq.ft. | |
| Data Source(s) | | MLS/FARES | | MLS/FARES | | | |
| Verification Source(s) | | MLS #K10018794MR | | MLS #A10022048MR | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Active Listing | | Active Listing | | | |
| Concessions | | L/D (-3%) | -16,347 | L/D (-3%) | -17,970 | | |
| Date of Sale/Time | | 31 DOM | | 28 DOM | | | |
| Location | Good | Superior | -5,000 | Similar | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 9,060 SF (7,256 SF | 7,305 SF | | 6,180 SF | +8,608 | | |
| View | None | None | | None | | | |
| Design (Style) | Conventional | Similar | | Similar | | | |
| Quality of Construction | Average | Average | | Average | | | |
| Actual Age | 1986 (24 yrs) | 1989 (21 yrs) | | 1987 (23 yrs) | | | |
| Condition | Good | Similar | | Similar | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 7    3    3 | 6    3    3 | | 7    3    3 | | | |
| Gross Living Area | 1,714 sq.ft. | 1,546 sq.ft. | +13,440 | 1,893 sq.ft. | -14,320 | sq.ft. | |
| Basement & Finished | None | None | | None | | | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | | |
| Heating/Cooling | FAU/CAC | Similar | | Similar | | | |
| Energy Efficient Items | None | None | | None | | | |
| Garage/Carport | 2-Car Garage | 2-Car Garage | | 3-Car Garage | -2,500 | | |
| Porch/Patio/Deck | Porch/Deck | Similar | | Similar | | | |
| Fireplace | 1-Fireplace | 2-Fireplaces | -2,500 | 1-Fireplace | | | |
| Pool/Spa | Pool/Spa | None | +20,000 | None | +20,000 | | |
| APN | 8765-017-028 | 8765-009-075 | | 8765-022-034 | | | |
| Net Adjustment (Total) | | ☒ +  ☐ - | $      9,593 | ☐ +  ☒ - | $     -6,182 | ☐ +  ☐ - | $ |
| Adjusted Sale Price | | Net Adj.    1.8  % | | Net Adj.    1.0  % | | Net Adj.    % | |
| of Comparables | | Gross Adj. 10.5 % | $   554,493 | Gross Adj. 10.6 % | $   592,818 | Gross Adj.   % | $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #4 | COMPARABLE SALE #5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | None in the past 36 months | Not applicable | Not Applicable | |
| Price of Prior Sale/Transfer | N/A | | | |
| Data Source(s) | FARES | | | |
| Effective Date of Data Source(s) | 04/07/2010 | | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Analysis/Comments    See Page 3

Form 2055 (AC) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

**DEFINITION OF MARKET VALUE:**  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

> * Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**  The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1.  The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it.  The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title.  The property is appraised on the basis of it being under responsible ownership.

2.  The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area.  Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5.  The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value.  These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6.  The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal.  Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7.  The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct.  The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8.  The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10.  The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent.  The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

California Wilshire Appraisal
Form ACR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. HMH 1004013; Page #9

Case 2:09-bk-46380-ER   Doc 13-3   Filed 04/19/10   Entered 04/19/10 19:00:25   Desc
Exhibit Exhibits 4-6 of Supp. Cho Declaration   Page 16 of 24

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**  20944 Quail Run Drive, Walnut, CA 91789

**APPRAISER:**                                                    **SUPERVISORY APPRAISER (only if required):**

Signature: _____            Signature: _____
Name:  Ho Joo Lee                                              Name: _____
Date Signed:  04/09/2010                                        Date Signed: _____
State Certification #:  CA AG 013395                            State Certification #: _____
or State License #: _____            or State License #: _____
State: _____            State: _____
Expiration Date of Certification or License:  2/4/2011            Expiration Date of Certification or License: _____

◻ Did    ◻ Did Not Inspect Property

Form ACR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE





SUBJECT PHOTO ADDENDUM

| Borrower/Client: | N/A |
| Address: | 20944 QUAIL RUN DRIVE |
| City: | WALNUT, CA 91789 |
| Lender/Client: | HANMI BANK |



FRONT VIEW



WEST SIDE VIEW



STREET SCENE - QUAIL RUN DRIVE

| Borrower/Client: | N/A |
| Address: | 20944 QUAIL RUN DRIVE |
| City: | WALNUT, CA 91789 |
| Lender/Client: | HANMI BANK |



**COMPARABLE 1**
20878 QUAIL RUN DRIVE, DIAMOND BAR, CA 91789



**COMPARABLE 2**
2703 S. GEORGE LANE, WALNUT, CA 91789



**COMPARABLE 3**
20821 E. ROCKY POINT LANE, DIAMOND BAR, CA 91789

| Borrower/Client: | N/A |
| Address: | 20944 QUAIL RUN DRIVE |
| City: | WALNUT, CA 91789 |
| Lender/Client: | HANMI BANK |



**COMPARABLE 4 (LISTING 1)**
2802 WOODVIEW COURT, WALNUT, CA 91789



**COMPARABLE 5 (LISTING 2)**
20764 E. RIM LANE. WALNUT, CA 91789

**EXHIBIT 6**

**B6D** (Official Form 6D) (12/07)

**IN RE** <u>Finch, Helen</u>                                                                                                                               Case No. _____
                          Debtor(s)                                                                                                                                            (If known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is the creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H – Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim Without Deducting Value of Collateral" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion, if Any" on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND ACCOUNT NUMBER. *(See Instructions Above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. **2921**<br><br>**Hanmi Bank**<br>**Rowland Heights Office**<br>**18729 East Colima Road**<br>**Rowland Heights, CA  91748** | X | | **Personal guaranty of loan to Whiskey Barrel & Cigar Shoppe, a general partnership.  Amount of claim shown is principal balance;  does not include accrued interest and charges, if any.  This claim is secured by a second deed of trust on debtor's personal residence.**<br><br>VALUE $ **650,000.00** | | | | **340,000.00** | |
| ACCOUNT NO. **2729**<br><br>**Nationstar Mortgage, LLC**<br>**Bankruptcy Notification**<br>**350 Highland Drive**<br>**Lewisville, TX  75067** | | | **1st Trust Deed Mortgage holder for Helen**<br><br>VALUE $ **650,000.00** | | | | **218,174.37** | |
| ACCOUNT NO.<br><br><br>VALUE $ | | | | | | | | |
| ACCOUNT NO.<br><br><br>VALUE $ | | | | | | | | |

____ **0** continuation sheets attached

|  | Subtotal<br>(Total of this page) | $ **558,174.37** | $ |
|---|---|---|---|
|  | Total<br>(Use only on last page) | $ **558,174.37** | $ |
|  |  | (Report also on Summary of Schedules.) | (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.) |

© 1993-2009 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

B8 (Official Form 8) (12/08)

**United States Bankruptcy Court**
**Central District of California**

IN RE:                                              Case No. _____

**Finch, Helen**
_____    Chapter **7** _____
                        Debtor(s)

## CHAPTER 7 INDIVIDUAL DEBTOR'S STATEMENT OF INTENTION

**PART A** – Debts secured by property of the estate. *(Part A must be fully completed for **EACH** debt which is secured by property of the estate. Attach additional pages if necessary.)*

| Property No. 1 | |
|---|---|
| **Creditor's Name:**<br>**Hanmi Bank** | **Describe Property Securing Debt:**<br>**SFR located at 20944 Quail Run Drive, Diamond Bar, CA  917** |

Property will be *(check one)*:
☐ Surrendered  ☑ Retained

If retaining the property, I intend to *(check at least one)*:
☐ Redeem the property
☐ Reaffirm the debt
☑ Other. Explain **Retain and pay pursuant to contract or until foreclosure**  (for example, avoid lien using 11 U.S.C. § 522(f)).

Property is *(check one)*:
☑ Claimed as exempt  ☐ Not claimed as exempt

| Property No. 2 (if necessary) | |
|---|---|
| **Creditor's Name:**<br>**Nationstar Mortgage, LLC** | **Describe Property Securing Debt:**<br>**SFR located at 20944 Quail Run Drive, Diamond Bar, CA  917** |

Property will be *(check one)*:
☐ Surrendered  ☑ Retained

If retaining the property, I intend to *(check at least one)*:
☐ Redeem the property
☐ Reaffirm the debt
☑ Other. Explain **Allow foreclosure to occur in due course**  (for example, avoid lien using 11 U.S.C. § 522(f)).

Property is *(check one)*:
☑ Claimed as exempt  ☐ Not claimed as exempt

**PART B** – Personal property subject to unexpired leases. *(All three columns of Part B must be completed for each unexpired lease. Attach additional pages if necessary.)*

| Property No. 1 | | |
|---|---|---|
| **Lessor's Name:** | **Describe Leased Property:** | Lease will be assumed pursuant to 11 U.S.C. § 365(p)(2):<br>☐ Yes ☐ No |

| Property No. 2 (if necessary) | | |
|---|---|---|
| **Lessor's Name:** | **Describe Leased Property:** | Lease will be assumed pursuant to 11 U.S.C. § 365(p)(2):<br>☐ Yes ☐ No |

____ continuation sheets attached *(if any)*

**I declare under penalty of perjury that the above indicates my intention as to any property of my estate securing a debt and/or personal property subject to an unexpired lease.**

Date: _____**December 22, 2009**_____        */s/ Helen Finch*
                                        Signature of Debtor

                                        Signature of Joint Debtor

© 1993-2009 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only